IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MICHAEL PEARL,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Civil No. 12-208-CJP** |
| ) | |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Michael Pearl is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI).[1]

**Procedural History**

Plaintiff applied for benefits in June, 2006, alleging disability beginning on February 9, 2001.  (Tr. 229, 234).  The application was denied by an Administrative Law Judge (ALJ) after an evidentiary hearing. (Tr. 139-148).  The Appeals Council then remanded the case for further proceedings. (Tr. 149-152). The case was assigned to a different ALJ on remand, Karen McCoy. After holding another evidentiary hearing, ALJ McCoy denied the application for benefits in a decision dated September 22, 2010.  (Tr. 17-28).  Plaintiff's request for review was denied by the Appeals Council, and the September 22, 2010, decision became the final agency decision subject to review here.  (Tr. 5).

Plaintiff has exhausted his administrative remedies and has filed a timely complaint in

---

[1]This case was referred to the undersigned for final disposition upon consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 13.

this court.

## Issues Raised by Plaintiff

Plaintiff raises the following issues:

1. The ALJ erred in weighing the medical opinions, including that of treating doctor Michelle Jenkins, M.D.

2. The testimony of the vocational expert (VE) did not support the ALJ's finding that there are a significant number of jobs that plaintiff could do where there was no evidence of the number of jobs with a sit/stand option.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. §§ 423(d)(3) and 1382c(a)(3)(C). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  It must be determined:  (1) whether the claimant is presently unemployed;

---

[2]The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  For all intents and purposes relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.  Most citations herein are to the DIB regulations out of convenience.

(2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **Schroeter v. Sullivan, 977 F.2d 391, 393 (7th Cir. 1992); see also, 20 C.F.R. §§ 404.1520(b-f).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether Mr. Pearl was, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See, Books v. Chater, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing **Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson v. Perales, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, **Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ McCoy followed the five-step analytical framework described above. She

determined that Mr. Pearl had not been engaged in substantial gainful activity since the alleged onset date.  She noted that Mr. Pearl had received social security disability benefits from 2000 to 2004, but his benefits were terminated due to medical improvement.  Because a prior application was denied on May 24, 2006, the earliest onset date was May 25, 2006.  She determined that Mr. Pearl was insured for DIB through December 31, 2007.  The ALJ found that plaintiff had severe impairments of knee pain with probable patellofemoral syndrome, back pain secondary to compression fractures in the thoracic spine and arthritis, polyneuropathy,[3] adjustment disorder with depressed mood, respiratory condition, history of cataract surgery, history of bilateral carpal tunnel syndrome with surgery, and history of seizures.

The ALJ further determined that plaintiff's impairments do not meet or equal a listed impairment.  The ALJ found that Mr. Pearl had the residual functional capacity to perform a limited range of work at the light exertional level.  His limitations included a need for a sit/stand option.  A vocational expert testified that he could perform jobs which exist in significant numbers in the national and local economy.  The ALJ accepted this testimony, and found that he is not disabled.  (Tr. 17-28).

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.  The following summary of the record is directed to the points raised by plaintiff.

**1.**     **Agency Forms**

Plaintiff was born in April, 1960, and was 46 years old on the alleged onset date of May

---

[3]"Polyneuropathy is the simultaneous malfunction of many peripheral nerves throughout the body."  See, www.merckmanuals.com/home/brain_spinal_cord_and_nerve_disorders/ peripheral_nerve_disorders/polyneuropathy.html, accessed on December 5, 2012.

25, 2006. (Tr. 267). He was 5' 7" and weighed 175 pounds. (Tr. 271). He alleged that he was unable to work because of hearing loss, fractures of T3, T4 and T12, reading and writing problems, blurred vision due to medication, arthritis, memory problems, polyneuropathy, asthma and restless leg syndrome. He had last worked in December, 1999. (Tr. 272).

Plaintiff had worked in the past as a lineman for a tree trimming company, certified nurse's assistant, rehabilitation technician, farm hand and janitor. (Tr. 273). He was in special education classes in school and had a GED. (Tr. 278).

Mr. Pearl submitted a report in July, 2006, in which he said that he tried to do some household chores such as dishes, laundry and yard work, but he was usually not able to do them because of cramping in his fingers and pain in his back and legs. He lived with his girlfriend and her daughters. (Tr. 291-298).

**2.    Evidentiary Hearing on August 4, 2010**

ALJ McCoy held an evidentiary hearing on August 4, 2010. Plaintiff was represented by counsel. (Tr. 73). The ALJ noted that plaintiff's prior claim had been denied on May 24, 2006, and that denial was final. Plaintiff's counsel agreed that his earliest onset date was therefore May 25, 2006. (Tr. 76-77).

Mr. Pearl testified that he dropped out of school in the tenth grade. He got a GED. He was certified as a nurse's assistant. (Tr. 82-83). He said that he was at a third grade level in spelling and reading. He took the GED test several times before he passed. (Tr. 84).

Plaintiff last worked in 1999. He received social security disability benefits from 2000 to 2004 because of cataracts. His vision improved after surgery and his benefits were terminated. (Tr. 86-87). Mr. Pearl testified that he was unable to work at the time of the hearing because of neuropathy, back trouble and arthritis in his knees and hands. (Tr. 87).

Mr. Pearl said that he lived with his girlfriend. He did not help out around the house. He mostly laid down and watched television. (Tr. 88-89). He took breathing treatments for COPD.

He was taking medication for seizures.  He had a seizure two days before the hearing.   He had not told his doctor that he still had seizures while taking the medication. (Tr. 90-92).

Plaintiff testified that he had back pain.  He had received injections, but could not afford any more.  He said "They won't give me no pain medicine because I take enough medication as it is so my life is mostly in pain during, like 7-24." (Tr. 94).  He walked with a cane, which was prescribed by a doctor. (Tr. 95).  He had pain and weakness in his legs due to neuropathy, and pain in his knees. (Tr. 102-103).

His medications caused side effects of blurred vision, dizziness and inability to concentrate, mostly when he took his evening dose. (Tr. 99).

He had surgery in the past for carpal tunnel on both wrists, and surgery on his elbow.  He still had problems with his hands such that his fingers got stiff and locked up. (Tr. 101-102).

A vocational expert also testified.  The ALJ asked him to assume a person who could do light work with limitations of occasional climbing ramps and stairs; occasional bending, stooping, kneeling and crouching; no work on ladders, ropes or scaffolds; no work at unprotected heights or around moving machinery; with vision limited to 20/40 in the right eye and 20/30 in the left.  The person was able to understand and carry out both simple and detailed job instructions, respond appropriately to changes in the routine and interact adequately with supervisors, coworkers and the public.  The ALJ also added a limitation to standing/walking no more than four hours a day.  The VE testified that this last limitation constituted a sit/stand option.  He explained that the *Dictionary of Occupational Titles* does not define sit/stand option.  However, in his experience "there are light duty positions that are sedentary in nature and the light duty comes from the component of the weight that potentially is lifted, up to 20 pounds." (Tr. 107-109).

The ALJ asked for examples of such jobs.  The VE identified the jobs of ticket seller, order caller, collator operator and small products assembly. (Tr. 110).  The VE testified that

-6-

these jobs are "sedentary sit stand positions." (Tr. 110). He also testified that each of these jobs existed in significant numbers in the regional and national economies. For example, he said that there were 3,700 ticket taker jobs in the regional economy and 88,000 ticket taker jobs in the national economy. (Tr. 109).

### 3. Medical Records

In January, 2003, an EMG study was consistent with mild mixed sensory motor polyneuropathy in the legs. (Tr. 383).

Dr. Terrence Glennon treated plaintiff for back pain caused by compression fractures in 2004 and 2005. (Tr. 389 -396). X-rays taken in April, 2004, showed compression fractures at T3 and T4. (Tr. 394). In September, 2004, a lumbar MRI showed a 30% compression fracture at T12 with no evidence of disc herniation or spinal stenosis. (Tr. 405). Dr. Glennon prescribed water therapy, which gave plaintiff "marvelous relief," but he had to stop going because of dizziness. (Tr. 392). Dr. Glennon prescribed Darvocet. (Tr. 389).

In April, 2006, Dr. Glennon assessed plaintiff's physical abilities. This report was submitted in connection with plaintiff's prior application for benefits. He opined that plaintiff could occasionally lift 50 pounds and frequently lift 25 pounds, and that he could stand/walk for a total of 6 out of 8 hours. He needed to be able to alternate sitting and standing to relieve pain due to his thoracic compression fractures. He had some postural limitations. (Tr. 421-424).

Mr. Pearl was treated by Dr. Alam, a neurologist, in 2004 and 2005. Dr. Alam prescribed Elavil and Neurontin for his polyneuropathy, restless leg syndrome and low back pain. (Tr. 375-388). Dr. Alam noted that he had post-traumatic positional vertigo, for which he was taking Neurontin. (Tr. 403).

On a referral from Dr. Alam, plaintiff was evaluated at the Pain Management Center of Marion in January, 2006. On physical exam, he was able to walk on his heels and toes. He had no tenderness in his cervical spine. He had mild tenderness from T8 to T12, with no

paravertebral spasm. He had mild tenderness in his lumbar spine with no spasm. Range of motion of the lumbar spine was limited. Strength in his upper and lower extremities was normal. Sensory examination was normal. Dr. Malla recommended a course of facet joint nerve blocks. (Tr. 407-418). Nerve blocks were done in February and April, 2006, which gave him some temporary relief. In April, 2006, Dr. Malla discontinued his pain medication (Lortab) because he had tested positive for amphetamines for the second time. (Tr. 419-420). In June, 2006. Dr. Malla gave plaintiff an epidural steroidal injection. His drug screen showed no illegal substances. (Tr. 436).

Much of Mr. Pearl's treatment was at the REA Clinic/Christopher, which is a primary care provider. In August, 2006, he complained of pain in his legs and knees. The doctor noted that he was taking pain medications, and indicated he would refer him to an orthopedist. (Tr. 652).

In September, 2006, Harry J. Deppe, Ph.D., performed a consultative psychological evaluation. Mr. Pearl had no delusional thinking, and was oriented to time, place and person. He had no difficulty staying on task. His fund of general knowledge was adequate. His memory and abstract reasoning skills were intact. Dr. Deppe concluded that Mr. Pearl had intact ability to follow simple instructions, maintain attention to perform simple, repetitive tasks, relate to others and to withstand the stress of day-to-day work activity. (Tr. 472-475).

A consultative physical examination was performed by Dr. Leung in September, 2006. Plaintiff told Dr. Leung that he had decreased short and long term memory and some hearing problems. He complained of back pain, knee pain and numbness in his legs due to neuropathy. On exam, hearing was within normal limits. He walked with short strides and a mild limp and waddle. He was able to heel walk and to squat, but not to toe walk. Forward flexion of the lumbar spine was limited to 85 degrees out of 90; otherwise, his range of motion was full. Arm, leg and grip Strength were full. Sensation to light touch and vibration in the feet was within

normal limits. His back was nontender. He had decreased short term memory on gross testing. (Tr. 476-481).

Mr. Pearl was evaluated by the State Division of Rehabilitation Services in November, 2006. The evaluation was done by a "vocational evaluator." He had been evaluated by that agency before in 2001. He said that he passed the GED test after about five tries. He obtained CNA and habilitation technician certificates from Shawnee College in 1996. He had not worked since the previous evaluation in 2001. It was noted that, since he had a GED and a CNA certification, the evaluator felt he read well enough to be tested using the Ability Profiler program. However, subsequent assessment indicated that he read at a lower level than was expected. IQ testing produced a full scale score of 85 (low average), verbal scale score of 77 (borderline) and performance scale of 98 (average). Academic achievement testing results placed him at grade equivalent of 3.5 in broad reading and grade equivalent of 5 in reading comprehension. The evaluator felt he was capable of learning and performing at least some of the tasks associated with jobs such as cashier, counter and rental clerk, office clerk and shipping, receiving and traffic clerk. The only physical testing was an assessment of fine motor abilities. His score on bimanual dexterity testing was 86, and his score on total fine motor was 94. Scores in the 85 to 115 range are average. (Tr. 550-564).

The only medical record from the year 2007 is from Franklin-Williamson Human Services. Plaintiff was evaluated there for depression in May, 2007. He gave a history of having injured his back in a car accident in 1993. He said that he had pain from neuropathy in his lower body and restless leg syndrome. He said that he still had vision problems after cataract surgery and he had a constant ringing in both ears. He said that he was depressed and anxious because he was unable to work or enjoy life. He had been taking medication prescribed by the REA Clinic, but it did not control his depression. He told the evaluator that he had been assessed by the Department of Rehabilitation and that he had been told that he could not be trained for work

because he scored on the level of a third-grader.  On exam, his thought content was normal.  His concentration and ability to focus were said to be impaired due to his pain and disability.  The diagnosis was major depression.  Treatment by a psychiatrist for medication evaluation and monitoring and individual mental health therapy were recommended.  There is no indication that Mr. Pearl received such treatment or therapy.  (Tr. 512-534).

Mr. Pearl went to the REA Clinic on March 10, 2008, "to have papers filled out for IPA card."  (Tr. 567).  On exam, he had tenderness in his low back with reduced range of motion.  He had no crepitation or tenderness in the joints of his lower extremities.  His gait was normal.  Strength was full in the upper and lower extremities.   He had no muscle atrophy. An MRI of the lumbar spine was ordered.  (Tr. 568-570)

A lumbar MRI done on March 19, 2008, showed minimal lumbar spondylosis, minimal/mild facet arthropathy and minimal disc disease.  There was no spinal canal stenosis.  There was minimal foraminal stenosis at L2-3 and L3-4, and anterior wedging at T12.  (Tr. 539-540).

He returned to REA Clinic to get the results of the MRI in April, 2008.  The doctor's notes are difficult to read, but they appear to indicate that straight leg raising was positive.  There is a reference to "neurology."  (Tr. 566).

Mr. Pearl was seen by physician's assistant M. Anders at REA Clinic from February, 2008, through July, 2008.  (Tr. 590-606).   On May 28, 2008, he complained of continuing pain in his knees and back.  He asked PA Anders to fill out paperwork so he could get a medical card.  (Tr. 596).  On exam, he had crepitus with extension and flexion of both knees, a full passive range of motion with more pain on extension.  (Tr. 596).  Mr. Pearl saw PA Anders for an early refill of Darvocet on June 18, 2008.  Another doctor had prescribed physical therapy, but he could not afford it.  She indicated she would try to get him set up with a physical therapy provider that had an assistance program.  (Tr. 592).

X-rays of both knees were normal on May 29, 2008. (Tr. 624). An x-ray of the left knee on June 5, 2008, showed no abnormality and "no definite radiographic evidence of osteoarthritis." (Tr. 623).

PA Anders completed a report regarding plaintiff's physical RFC in June, 2008. She opined that plaintiff could occasionally lift 10 pounds and frequently lift 10 pounds, could stand/walk for a total of less than 2 hours out of an 8-hour day, and could sit for less than 6 out of 8 hours. She opined that he could never do any postural activities. She also said that he was limited to only occasional reaching and fingering and to frequent handling due to arthritis. (Tr. 546-549).

PA Anders also assessed plaintiff's mental RFC in July, 2010. She opined that he had moderate limitations with respect to simple and detailed instructions due to a learning disability, depression, and the effects of his pain medication. She found that he had no restrictions in his ability to interact with the public, coworkers or supervisors. (Tr. 544-545).

Plaintiff saw a provider at REA Clinic in September, 2008. He or she noted that he was taking Lyrica, Neurontin and Elavil, and would not give him Darvocet. He said that he did not want to see Dr. Alam because, in the past, Dr. Alam had sent him to physical therapy and he did not want to go to physical therapy. (Tr. 647). He saw another provider at the Clinic in October, 2008, who noted that he complained of numbness and tingling in his legs and that he had neuropathy from disc disease. This provider prescribed Darvocet. (Tr. 646).

Plaintiff continued to be treated at REA Clinic in 2009 and 2010. Many of the notes are difficult to read. Plaintiff continued to complain of back and leg pain, shortness of breath and depression. (Tr. 638-644, 665-676). In March, 2009, he said he was using a cane to walk long distances. (Tr. 642). In June, 2009, he complained of muscle spasms and asked for a prescription for a back brace. (Tr. 641).

Dr. Michelle Jenkins saw plaintiff at REA Clinic in 2010.  On March 26, 2010, he complained of "intermittent leg claudification."[4]  She ordered a Doppler study, which was normal. (Tr. 670-675).   On July 7, 2010, plaintiff saw Dr. Jenkins to have paperwork filled out for his disability application.  Plaintiff was wearing a lumbar support.  He complained of uncontrolled back spasms.  On exam, forward flexion was limited to 60 degrees.   Flexibility was decreased.  Straight leg raising was negative bilaterally.  (Tr. 666).  Dr. Jenkins prescribed Zoloft for depression and Flexeril for muscle spasms.  (Tr. 666, 667)

Dr. Jenkins completed a report regarding plaintiff's physical RFC on July 20, 2010.  She opined that plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds, could stand/walk for a total of less than 2 hours out of an 8-hour day, and could sit for less than  6 out of 8 hours.  She opined that he could never do postural activities, except that he could occasionally balance, and that he was limited to only occasional reaching.  She noted that he had degenerative disc disease with facet arthropathy as shown by MRI in March, 2008, along with a history of thoracic fractures and peripheral neuropathy.  She also noted that he had decreased flexibility in his spine and forward flexion was limited.  She recommended that he avoid environmental irritants due to COPD/emphysema.  (Tr. 660-663).

Dr. Jenkins also assessed plaintiff's mental RFC in July, 2010.  She opined that he had moderate limitations with respect to simple instructions and extreme limitations with respect to detailed instructions.  She found that he had moderate restrictions in his ability to interact with the public and with supervisors.  She noted that he was learning disabled with 3rd grade reading comprehension by DORS testing and that he had clinical depression and social phobias.  (Tr.

---

[4] "Claudication is pain caused by too little blood flow during exercise. Sometimes called intermittent claudication, this condition generally affects the blood vessels in the legs, but claudication can affect the arms, too."  See, www.mayoclinic.com/health/claudication/DS01052, acccessed on December 5, 2012.

658-659).

**4.      RFC Evaluations by State Agency Consultants**

A state agency physician evaluated plaintiff's RFC in October, 2006, and concluded he could do work at the light exertional level, limited to only occasional postural activities and no climbing of ladders, ropes or scaffolds. This assessment was based on a review of the records, and not an examination. (Tr. 460-467). The ALJ rejected this opinion as inconsistent with the record as a whole. See, Tr. 25.

Howard Tin, Psy.D., completed a Psychiatric Review Technique form on October 6, 2006.[5] (Tr. 468-471). This assessment was based on a review of medical records and not a personal examination. Dr. Tin opined that Mr. Pearl had adjustment disorder with depressed mood. A section of the form required him to assess functional limitations with reference to the so-called B Criteria, which are the criteria set forth in paragraph B of the mental disorders Listings. See, 20 C.F.R. Subpt. P. App. 1, §§12.00 et seq. Dr. Tin rated his restriction of activities of daily living, and difficulties in maintaining concentration, persistence or pace as "mild." He rated plaintiff's difficulties in maintaining social functioning as "moderate." See, Tr. 456.

Dr. Tin also completed a Mental RFC Assessment form. (Tr. 468-471). He rated plaintiff as moderately limited in a number of areas, including the ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, and accept instructions and criticism from supervisors. In his narrative conclusions, Dr. Tin noted that plaintiff had difficulty with detailed instructions and that he should be limited to work that does not require interaction with the

---

[5]The Psychiatric Review Technique form is part of the "special technique" used by the agency in evaluating alleged mental impairments. The special technique is explained in 20 C.F.R. §404.1520a.

general public. The ALJ rejected this opinion as inconsistent with the record as a whole. See, Tr. 25.

## Analysis

Plaintiff argues that the ALJ erred in weighing the medical opinions, including the opinions expressed by Dr. Jenkins.

Dr. Jenkins was a treating doctor. Social security regulations refer to a treating doctor as a "treating source." With regard to the assessment of treating source opinions, 20 C.F.R. §404.1527(d)(2) states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.</u> [emphasis added]

" Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). A treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. ***Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000);** ***Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).**

If the ALJ determines that a treating doctor's opinions is not entitled to controlling weight, she is required to evaluate the treating doctor's opinion and determine what weight to give it considering the factors set forth in 20 C.F.R. §404.1527(d). An ALJ must give "good

reasons" for discounting a treating doctor's medical opinion; if the opinion does not merit controlling weight, the ALJ must consider the "checklist of factors" set forth in §404.1527(d). **Campbell v. Astrue, 627 F.3d 299, 308 (7th Cir. 2010)**, citing **Larson v. Astrue, 615 F.3d 744, 751 (7th Cir. 2010).**

As the Seventh Circuit recently stated, "An ALJ can give less weight to a doctor's opinion if it is internally inconsistent or inconsistent with the other substantial evidence in the record as long as she articulates her reasons for giving the opinion less weight, 20 C.F.R. § 404.1527(c)(3), (4); *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004)." **Hall ex rel. Hall v. Astrue, 2012 WL 2948173, *2 (7th Cir. 2012).** The ALJ is required only to "minimally articulate" her reasons for accepting or rejecting evidence, a standard which the Seventh Circuit has characterized as "lax." **Berger v. Astrue, 516 F.3d 539, 545 (7th Cir. 2008)**; **Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008)**.

ALJ McCoy discussed the various medical opinions in three paragraphs at Tr. 25-26. She did not discuss any of the doctors by name, but referred to the reports by the exhibit numbers that were assigned at the agency level. Dr. Jenkins' report as to Mr. Pearl's physical condition was designated as Exh. C30F.

The only explicit reference to Dr. Jenkins' reports is one sentence in which the ALJ said "The range of light work is more consistent in terms of the lifting restrictions given in the treating opinion from July 2010. (Exh. C30F)." (Tr. 25). The ALJ did not specifically discuss any of Dr. Jenkins' opinions other than her opinion as to how much weight Mr. Pearl could lift.

ALJ McCoy failed to even minimally articulate her reasons for rejecting most of Dr. Jenkins' medical opinions. An ALJ may not selectively consider a doctor's report, ignoring the parts that conflict with her decision. **Godbey v. Apfel, 238 F.3d 803, 808 (7th Cir. 2000)**;

*Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).  Dr. Jenkins opined that Mr. Pearl could stand/walk for less than a total of 2 hours a day, and sit for less than a total of 6 hours a day.  The VE acknowledged that a person with these restrictions could not work full-time.  (Tr. 113).  It was incumbent upon the ALJ to explain why she rejected this opinion.

The Commissioner defends the ALJ's handling of Dr. Jenkins' report by pointing out that the ALJ noted that Dr. Glennon said that plaintiff was able to do medium work in April, 2006.  The Commissioner goes on to argue that the ALJ was justified in rejecting Dr. Jenkins' opinion because both doctors relied on the same compression fractures for their opinions, and the record does not indicate that Mr. Pearl's condition had worsened significantly since Dr. Glennon wrote his report in 2006.  The Court cannot accept this argument.  First, this line of reasoning was not articulated by the ALJ.  This Court's review is limited to the reasons stated in the ALJ's decision.  **See,** *McClesky v. Astrue*, **606 F.3d 351, 354 (7th Cir. 2010) (It is "improper for an agency's lawyer to defend its decision on a ground that the agency had not relied on in its decision....");** *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010).  Secondly, this line of reasoning actually *conflicts* with the ALJ's reasoning.  ALJ McCoy rejected the opinions of the state agency consultants who assessed RFC in October, 2006, because they did not review all of the evidence received at the hearing level.  (Tr. 25).  This indicates that ALJ McCoy thought that Mr. Pearl's condition had changed since 2006.  Further, the ALJ obviously rejected Dr. Glennon's opinion that Mr. Pearl was able to do medium work.  It is illogical, therefore, to argue that the ALJ was justified in rejecting Dr. Jenkins' opinion because her opinion conflicted with Dr. Glennon's.

The ALJ made only vague, general statements in discussing the other medical opinions.  She said that opinions limiting plaintiff to sedentary work were "not consistent with the record."  She said that limitations to "never" doing postural activities "seemed extreme given the record as

a whole. (Exh. C23F)." Exh C23F is PA Anders' report.  The only specific piece of evidence that she cited to support this conclusion was that plaintiff was able to do housekeeping chores, which the ALJ said would entail some stooping, kneeling and crouching.  On this point, the ALJ cited to Dr. Deppe's report in which he said that plaintiff told him that "he spends the vast majority of his time watching television and doing housework." (Tr. 474).   Contrary to the ALJ's assumption, there is no evidence that plaintiff did chores that entailed stooping, kneeling and crouching on anything approaching a regular basis.  Further, the Seventh Circuit has criticized the "casual equating of household work to work in the labor market."  **_Gentle v. Barnhart_, 430 F.3d 865, 867 (7th Cir. 2005).  See also, _Bjornson v. Astrue_, 671 F.3d 640, 647 (7th Cir. 2012), and cases cited therein.**

      The ALJ was required by 20 C.F.R. §§ 404.1527(f) and 416.927(f) to consider the state agency physicians' findings of fact about the nature and severity of the claimant's impairment as opinions of non-examining physicians; while she was  not bound by the opinions, she was required to consider them and explain the weight given to the opinions in her decision.  She failed to do so, in that she gave only vague, general reasons for rejecting them.  In particular, she did not articulate a good reason for rejecting the state agency consultant's opinion that Mr. Pearl had a moderate limitations in ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public and accept instructions and criticism from supervisors.  In fact, of all the medical opinions regarding Mr. Pearl's mental RFC, only one, Dr. Deppe, thought that he had intact memory and concentration.  The ALJ specifically found that Mr. Pearl had the ability to understand, remember and carry out detailed instructions.  She did not articulate her reasons for rejecting the contrary opinions of Dr. Tin, Dr. Jenkins and PA Anders to the contrary.

      With regard to plaintiff's second point, the Court agrees that the VE's testimony about the

sit/stand option was not a model of clarity.  However, it was certainly susceptible to the interpretation that all of the jobs that he mentioned would accommodate a sit/stand option. Plaintiff's counsel did not seek any clarification at the hearing, which suggests that the testimony was clearer when heard in person than it is when read from a cold transcript.  As the case must be remanded anyway, the Commissioner may want to clarify that issue further.

This Court concludes that ALJ failed to build the requisite "logical bridge" from the evidence to her conclusions.  **Scott v. Astrue**, 647 F.3d 734, 740 (7th Cir. 2011).  Remand is required where, as here, the decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review."  **Kastner v. Astrue,** 697 F.3d 642, 646 (7th Cir. 2010), citing  **Steele v. Barnhart**, 290 F.3d 936, 940 (7th Cir. 2002).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Pearl is disabled or that he should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

### Conclusion

The Commissioner's final decision denying Michael Pearl's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED:  December 6, 2012.**

                         s/ Clifford J. Proud
                         **CLIFFORD J. PROUD**
                         **UNITED STATES MAGISTRATE JUDGE**